AUSA: Joe Zabel

| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK | **25 MAG 3728** |
| UNITED STATES OF AMERICA<br><br>v.<br><br>MOUSSA NIAKATE,<br>a/k/a "BABA,"<br>a/k/a "JD Baba,"<br>a/k/a "Damar Ketzo,"<br>a/k/a "Damar Kelzo,"<br>a/k/a "Hamet Niakate Blacky Guenz,"<br><br>Defendant. | **COMPLAINT**<br><br>Violations of 18 U.S.C. §§ 2320(a)(1) and 2<br><br>COUNTY OF OFFENSE:<br>NEW YORK |

SOUTHERN DISTRICT OF NEW YORK, ss.:

GREGORY BOBEV, being duly sworn, deposes and says that he is a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI"), and charges as follows:

## COUNT ONE
### (Trafficking in Counterfeit Goods or Services)

1. From at least in or about October 2025, up to and including at least in or about November 2025, in the Southern District of New York and elsewhere, MOUSSA NIAKATE, a/k/a "BABA," a/k/a "JD Baba," a/k/a "Damar Ketzo," a/k/a "Damar Kelzo," a/k/a "Hamet Niakate Blacky Guenz," the defendant, knowingly and intentionally trafficked and attempted to traffic in goods and services, and knowingly used counterfeit marks on and in connection with such goods and services, to wit, NIAKATE distributed counterfeit goods, including, but not limited to, counterfeit shoes, handbags, and other items from at least two storage units at a storage facility in Manhattan, New York.

(Title 18, United States Code, Sections 2320(a)(1) and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

2. I have been involved in the investigation of this matter, and I base this Complaint on that experience, as well as on my conversations with other law enforcement agents, and my examination of various reports, recordings, photographs, communications, and records. Because this Complaint is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Overview

3. Since in or about October 2025, HSI and the New York City Police Department ("NYPD") have been investigating MOUSSA NIAKATE, a/k/a "BABA," a/k/a "JD Baba," a/k/a "Damar Ketzo," a/k/a "Damar Kelzo," a/k/a "Hamet Niakate Blacky Guenz," the defendant, for trafficking in counterfeit goods. As further described below, the investigation has uncovered evidence that NIAKATE operated a business engaged in the distribution of counterfeit shoes, handbags, and other items from two particular storage units ("Storage Unit-1" and "Storage Unit-2," together the "Storage Units") that he controlled in the basement of a storage facility on Spring Street in Manhattan, New York (the "Storage Facility"). During two transactions between in or about October and November 2025, which were video recorded, NIAKATE sold an undercover law enforcement officer with the NYPD ("UC-1") counterfeit shoes, handbags, and a belt, which were contained in the Storage Units. On or about November 24, 2025, law enforcement executed a search warrant at the Storage Units and found NIAKATE with a key in his hand trying to close and lock the door to Storage Unit-1 as law enforcement was approaching. Law enforcement seized the entire contents of the Storage Units, which contained approximately thousands of items bearing trademarks of luxury brands, and which licensed private investigators subsequently determined were counterfeit.

## Initial Tip

4. Based on my conversations with other law enforcement officers, my participation in this investigation, and my review of law enforcement records, I know the following:

   a. In or about October 2025, HSI received information from an individual being prosecuted by a United States Attorney's Office in another district ("Witness-1")[1] regarding an individual known as "BABA," who, for the reasons set forth below, I believe to be MOUSSA NIAKATE, a/k/a "BABA," a/k/a "JD Baba," a/k/a "Damar Ketzo," a/k/a "Damar Kelzo," a/k/a "Hamet Niakate Blacky Guenz," the defendant, operating multiple storage units for the sale of counterfeit luxury goods at the Storage Facility.

   b. On or about October 27, 2025, HSI conducted a voluntary interview of Witness-1. Witness-1 stated that he had been purchasing counterfeit goods—for example, luxury clothing items fraudulently marked to appear as if they were made by certain luxury brands—from "BABA" for approximately six years. Witness-1 stated that "BABA" had operated as many as approximately four storage units full of counterfeit luxury items at various times at the Storage Facility. Witness-1 stated further that he would purchase counterfeit goods from "BABA" approximately every few months for himself and to give to family and friends, spending anywhere from approximately a few hundred dollars to approximately $4,000 for a single item, which, based on my conversations with Witness-1 and my participation in the investigation, I know was well below market value for authentic versions of those items. Witness-1 stated that he knew the items

---

[1] Witness-1 first spoke with law enforcement, on a voluntary basis, in or about October 2025, and has been cooperative with law enforcement since that time. Witness-1 previously pled guilty in another district to an unrelated fraud offense. The information Witness-1 has provided has been corroborated, in part, by other evidence gathered in the course of this investigation, including publicly available sources and other law enforcement records. Witness-1 is cooperating with law enforcement, in part, in the hopes of obtaining a more lenient sentence.

were counterfeit, in part, because "BABA" told him that "BABA" was able to order any item Witness-1 wanted, all Witness-1 needed to do was show an image of that to "BABA." Further, Witness-1 observed that approximately several of the boxes containing merchandise in the Storage Units had Chinese characters written on them—indicating they had likely been exported from China, rather than from the locations where authentic goods from these luxury brands are typically shipped for the American market.[2]

        c.    Witness-1 also provided law enforcement with specific information regarding the individual he knew as "BABA," including, among other things, that "BABA" used a phone number ending in 2747 (the "2747 Number"), the location of merchandise at the Storage Facility, and details about how Witness-1 made payments to "BABA."

        i.    With respect to the payments, Witness-1 identified a particular payment processing account ("Payment Processing Account-1," maintained by Payment Processing Application-1) enrolled as "NIAKSHOP LLC," which, based on records provided by Payment Processing Application-1, is registered to the 2747 Number. Witness-1 also identified a payment processing profile registered to a different payment processing application ("Payment Processing Account-2," housed by Payment Processing Application-2), which, based on records provided by Payment Processing Application-2, is registered under the name "Moussa Niakate" with the username "$mniakate." Witness-1 previously had sent money to both Payment Processing Account-1 and Payment Processing Account-2 to pay "BABA" for counterfeit goods. Witness-1 corroborated this by providing his own transaction history, which showed that he had sent payments to Payment Processing Account-2 for counterfeit goods purchased from "BABA," including a photograph of Witness-1's cellular phone displaying the information associated with Payment Processing Account-2.

        d.    Witness-1 also provided a screenshot of "BABA's" publicly available profile on a social media application ("Social Media Application-1"), which displayed the name "Hamet Niakate Blacky Guenz" and indicated that the individual was self-employed, lived in New York, New York, and was originally from Kayes, Mali.

Introduction of Undercover Officer and First Controlled Purchase

5.    Based on my involvement in this investigation and conversations with other law enforcement personnel, I know that on or about October 30, 2025, Witness-1 introduced UC-1 to MOUSSA NIAKATE, a/k/a "BABA," a/k/a "JD Baba," a/k/a "Damar Ketzo," a/k/a "Damar Kelzo," a/k/a "Hamet Niakate Blacky Guenz," the defendant.

        a.    On or about that same day, October 30, 2025, at approximately 2:30 p.m., UC-1 along with Witness-1, conducted a controlled purchase from MOUSSA NIAKATE at the Storage Facility, which was recorded on video. UC-1 and Witness-1 met with NIAKATE, who was referred to as "BABA" by Witness-1 during the transaction, inside the Storage Facility. NIAKATE escorted them to the elevator and down to the basement level. NIAKATE opened the

---

[2] Based on my training and experience investigating counterfeit goods trafficking, I know that China is a common source of counterfeit luxury goods, and that authentic luxury goods from these brands are not typically shipped to the American market directly from China with Chinese characters on their shipping boxes.

door to Storage Unit-1. Inside the unit, UC-1 observed numerous items that appeared to be from different luxury brands, including: Gucci, Louis Vuitton, Dior, Nike, Burberry, Moose Knuckles, Bottega Veneta, Yeezy, Chrome Hearts, and others.

        b.      UC-1 and Witness-1 selected one white/pink Louis Vuitton styled pair of sneakers for $225.00 and two black Dior styled pairs of sneakers for $480.00 total from Storage Unit-1. NIAKATE then escorted them to Storage Unit-2, a small room containing additional clothes and accessories from various luxury brands. From this unit, they selected one black Gucci styled belt for $120.00 and one pair of multicolored Gucci styled sandals for $120.00. All items came with original brand-looking boxes.

        c.      The initial total cost was approximately $945.00 for all of the items. However, NIAKATE offered a small discount on certain of the items, bringing the final total to approximately $930.00. NIAKATE provided UC-1 with the 2747 Number and told UC-1 to text him with any requests, stating he could obtain whatever additional goods UC-1 wanted. NIAKATE mentioned that he would be receiving a shipment of more luxury items the following week. After UC-1 paid approximately $930.00 in official funds for the items, NIAKATE escorted UC-1 and Witness-1 into the elevator and outside to the loading dock area.

        d.      Based on my training and experience investigating counterfeit goods trafficking, I know that the prices for the goods described above, which NIAKATE sold to UC-1, are significantly below the manufacturer's suggested retail price for authentic items from these luxury brands. Accordingly, I believe this further confirms UC-1's understanding that UC-1 was purchasing counterfeit goods from NIAKATE.

### Second Controlled Purchase and Authentication

    6.      Based on my involvement in this investigation and conversations with other law enforcement personnel, I know that law enforcement conducted a second controlled purchase from MOUSSA NIAKATE, a/k/a "BABA," a/k/a "JD Baba," a/k/a "Damar Ketzo," a/k/a "Damar Kelzo," a/k/a "Hamet Niakate Blacky Guenz," the defendant, on or about November 17, 2025 at the Storage Units:

        a.      The second controlled purchase of counterfeit goods from NIAKATE by UC-1 followed largely the same pattern as the first. UC-1 contacted the 2747 Number and arranged with NIAKATE to meet at the Storage Facility to purchase additional counterfeit luxury products. At approximately 1:45 p.m. on or about November 17, 2025, UC-1 met NIAKATE at the loading dock of the Storage Facility. NIAKATE escorted UC-1 inside the location and they took the elevator down to the basement level. NIAKATE unlocked and opened the door to Storage Unit-1. UC-1 again observed that the unit contained numerous items that appeared to be from certain of the luxury brands listed above, *see supra* ¶ 5, as well as others. UC-1 selected two Louis Vuitton styled handbags.

        b.      NIAKATE told UC-1 that he had more items in the other unit, *i.e.*, Storage Unit-2. NIAKATE then escorted UC-1 to Storage Unit-2. UC-1 observed a number of large boxes stacked along the wall next to Storage Unit-2. NIAKATE broke open some of the boxes, which appeared to contain clothing from brands including Chrome Hearts and Godspeed. NIAKATE then unlocked and opened the door to Storage Unit-2. Storage Unit-2 appeared to contain clothes

and accessories from various luxury brands. UC-1 selected one additional Louis Vuitton styled handbag from this unit. UC-1 asked for the total price for the three Louis Vuitton styled handbags. NIAKATE stated that the total price was approximately $1,200.00 but ultimately provided a discount and sold the bags to UC-1 for approximately $1,050.00.

      c.    Based on my training and experience investigating counterfeit goods trafficking, I know that these prices are also significantly below the manufacturer's suggested retail price for authentic items from these luxury brands.

      7.    Based on my personal involvement in this investigation, I know that law enforcement provided the items purchased by UC-1 during the October 30, 2025 controlled purchase and the November 17, 2025 controlled purchase at the Storage Units to a private investigator ("PI-1") for examination. PI-1 is a private investigator licensed in New York and New Jersey who is associated with Louis Vuitton, Christian Dior, and Gucci, and after training, is familiar with these brands' trademarks and anti-counterfeiting programs. PI-1 examined the Louis Vuitton styled sneakers obtained from Storage Unit-1, the Christian Dior styled sneakers obtained from Storage Unit-1, and the Gucci styled belt and sandals obtained from Storage Unit-1 on or about October 30, 2025, as well as the three Louis Vuitton styled handbags obtained from the Storage Units on November 17, 2025. PI-1 determined that all of the examined items are counterfeit and not genuine items manufactured, distributed, and sold by Louis Vuitton, Christian Dior, and Gucci respectively, that all of these products bear at least one counterfeit mark that is identical to a registered trademark, and that the items are the same type of goods for which these brands' trademarks are registered.

### Execution of Search Warrant on or about November 24, 2025

      8.    On or about November 24, 2025, law enforcement officers executed a search warrant of the Storage Units, as well as for the person of MOUSSA NIAKATE, a/k/a "BABA," a/k/a "JD Baba," a/k/a "Damar Ketzo," a/k/a "Damar Kelzo," a/k/a "Hamet Niakate Blacky Guenz," the defendant, and his electronic devices. Based on my involvement in this investigation and conversations with other law enforcement personnel, as well as my training and experience, I have learned that:

      a.    When they arrived at the Storage Facility, officers observed an individual in the basement level holding a key and locking the door to Storage Unit-1. As discussed in Paragraph 10, *infra*, this individual was identified as NIAKATE.

      b.    Law enforcement officers arrested NIAKATE and found two cellphones in his possession at the time of the search as well as keys, the bittings of which matched the locks for the Storage Units. After being Mirandized, NIAKATE stated that he had approximately $2,000 in cash on his person, which officers also recovered. He additionally had an identification card in his pocket identifying him as "Moussa Niakate" and attempted to disclaim any ownership interests in the Storage Units.

      c.    Inside Storage Unit-1, law enforcement officers observed and seized thousands of items bearing trademarks that resembled trademarks of luxury brands, including Louis Vuitton, Gucci, Dior, Nike, Burberry, and others that appeared to have been shipped from China, based on their shipping labels.

        d.      Law enforcement officers also searched Storage Unit-2 and observed and seized additional items bearing trademarks that resembled trademarks of luxury brands, that appeared to have been shipped from China, based on their shipping labels.

      9.      On or about November 24, 2025, that same day, law enforcement provided a large quantity of representative samples of the items seized from the Storage Units to licensed private investigators trained to recognize the trademarks of various luxury brands. These private investigators determined that all of the items they examined from Storage Unit-1 and Storage Unit-2 were counterfeit.

Identification of "BABA" As Moussa Niakate

      10.      Based on my conversations with other law enforcement personnel, my review of law enforcement reports and records, and my review of publicly available records, I know that law enforcement identified the individual known as "BABA" as MOUSSA NIAKATE, a/k/a "BABA," a/k/a "JD Baba," a/k/a "Damar Ketzo," a/k/a "Damar Kelzo," a/k/a "Hamet Niakate Blacky Guenz," the defendant, through the following:

        a.      Based on my review of Department of Homeland Security immigration records, I have learned that the 2747 Number is associated with an individual named "Moussa Niakate," who has an Alien Registration Number ending in -3177 and a Social Security Number ending in -8371 as one that NIAKATE has offered as his own.

        b.      The fact that "Moussa Niakate" uses the 2747 Number is further corroborated by: (i) NYPD arrest reports showing that an individual named "Moussa Niakate" provided the 2747 Number as his contact number in connection with multiple arrests, including as recently as in or about 2014; (ii) records from Payment Processing Account-1 indicating that the 2747 Number is enrolled under the business name "NIAKSHOP LLC," which appears to be a shortened portmanteau of "Niakate" and "shop;" and (iii) records from Payment Processing Account-2 showing that the 2747 Number is associated with Payment Processing Account-2, with the name "Moussa Niakate" and the username "$mniakate."

        c.      When law enforcement officers arrested the individual known as "BABA" on or about November 24, 2025, that individual had an identification document in his pocket bearing the name "Moussa Niakate" and was observed with a key in his hand attempting to lock the door to Storage Unit-1.

        d.      The profile for "Hamet Niakate Blacky Guenz," which Witness-1 identified as one of "BABA's" social media accounts, contains photographs that law enforcement compared to the individual arrested on or about November 24, 2025, *i.e.*, NIAKATE, and which appear to be the same person.

        e.      Law enforcement obtained rental records for the Storage Units. These records revealed that the Storage Units are rented under the name "Damar Ketzo," using a particular email address that contains the same name and a purported Pennsylvania driver's license in the name "Damar Ketzo." Searches of records maintained by the Pennsylvania Department of Motor Vehicles returned no results for a valid driver's license under the name "Damar Ketzo."

The photograph on the purported Pennsylvania driver's license appears consistent with the individual arrested on November 24, 2025, *i.e.*, NIAKATE. Based on the foregoing, I believe the purported Pennsylvania driver's license is a false identification document used by NIAKATE to rent the Storage Units while concealing his true identity.

WHEREFORE, I respectfully request that a warrant be issued for the arrest of MOUSSA NIAKATE, a/k/a "BABA," a/k/a "JD Baba," a/k/a "Damar Ketzo," a/k/a "Damar Kelzo," a/k/a "Hamet Niakate Blacky Guenz," the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

_____
GREGORY BOBEV
Special Agent
Homeland Security Investigations

Sworn to before me this 25th day of November, 2025.

_____
THE HONORABLE Valerie Figueredo
United States Magistrate Judge
Southern District of New York